OPINION OF THE COURT
Anthony J. Carpinello, J.
The five named petitioners are inmates at the Albion Correctional Facility in Albion, New York. At issue in this proceeding is respondent Governor George E. Pataki’s signing of Executive Order No. 5 on January 24,1995. In this Executive Order, the Governor directed the Commissioner of the Department of Correctional Services to promulgate regulations that would prevent the "future transfer to any temporary release program or residential treatment facility of any inmate sentenced as a violent felony offender convicted of a crime involving the infliction of serious physical injury, the use or threatened use of a dangerous instrument or the use or threatened use of a deadly weapon.” The commissioner thereafter filed emergency regulations amending 7 NYCRR 1900.4 (c) to bar any inmate from participation in temporary release whose current commitment is for a crime involving either the use or threatened use of a deadly weapon or a dangerous instrument or the infliction of serious physical injury. The amendment also listed a number of offenses, the commission of which would typically render the inmate ineligible for participation in the temporary release programs. By virtue of the Executive Order and the regula *332 tions amended in accordance with the Executive Order, petitioners are no longer eligible for participation in temporary release programs. Although none of the petitioners were actually participating in temporary release programs before the Executive Order was issued, two of the petitioners had been approved for participation and one had actually been moved to a different facility in order to begin participation in the program.
This case is complicated by the fact that the Legislature in June passed a statute amending Correction Law § 851 (2) to provide that "[t]he governor, by executive order, may exclude or limit the participation of any class of otherwise eligible inmates from participation in a temporary release program. Nothing in this paragraph shall be construed to affect either the validity of any executive order previously issued limiting the participation of otherwise eligible inmates in such program or the authority of the commissioner of the department of correctional services to impose appropriate regulations limiting such participation.” (L 1995, ch 3, § 29.) To this court’s knowledge, the Governor has not issued a new Executive Order in accordance with the authority granted by this section.
Thus, there are a number of interrelated issues before this court. The court must first determine whether the Governor could, by Executive Order, direct the commissioner to change the eligibility requirements for the temporary release program and eliminate inmates convicted of violent felonies from future participation in the program. If the answer to this question is yes, the next question posed by petitioners is whether the Executive Order by its terms nonetheless violates the due process rights of the two petitioners who were not permitted to participate in the program after having been approved for the program before the Executive Order was issued. If the court finds that the Governor lacked the authority to change the eligibility requirements for the temporary release program by Executive Order, the next question is whether the statute, which purports to grant this very authority to the Governor prospectively, is itself a proper delegation of legislative power to the executive branch.
Preliminarily, this court must determine the appropriateness of the CPLR article 78 procedure used by the petitioners to challenge the legitimacy of the respondents’ actions. While an article 78 proceeding is generally the appropriate vehicle to determine whether a statute is being applied in an unconstitutional manner, the Court of Appeals has consistently held that *333 conversion to a declaratory judgment action is appropriate where the constitutionality of a statute is at issue, or where the petitioners seek review of a continuing policy (see, e.g., Allen v Blum, 58 NY2d 954, 956; Matter of Zuckerman v Board of Educ., 44 NY2d 336, 343-344; Matter of Kovarsky v Housing & Dev. Admin., 31 NY2d 184, 191-192). As petitioners point out, their petition also challenges the respondents’ refusal to allow two of the petitioners to participate in the temporary release program, despite the fact that they had been approved for participation prior to the issuance of the Executive Order. Although this constitutes an "as applied” challenge properly raised in the context of an article 78 proceeding, it is apparent to this court that the thrust of petitioners’ argument is that the Governor exceeded his constitutional authority in issuing the Executive Order at issue in this case. Further, this case also raises an issue as to whether the Legislature improperly delegated legislative authority to the Governor in amending the Correction Law to permit the Governor to change the eligibility categories for the temporary release program. On balance, then, this court, in the exercise of its discretion, finds it appropriate to convert the instant article 78 proceeding to a declaratory judgment action (CPLR 3001).
Correction Law article 26, entitled "Temporary Release Programs for State Correctional Institutions”, defines the term "eligible inmate” as "a person confined in an institution who is eligible for release on parole or who will become eligible for release on parole or conditional release within two years” (Correction Law § 851 [2]). However, the statute goes on to provide that if an inmate was convicted of one of the violent felony offenses enumerated in Penal Law § 70.02, "where such offense involved the use or threatened use of a deadly weapon or dangerous instrument”, the inmate is not eligible to participate in a work release program until that inmate is eligible for parole or will be eligible for parole within 18 months. The statute provides that inmates convicted of escape or absconding, or homicide or certain sex offenses are ineligible for participation and also provides that inmates convicted of violent felonies cannot participate in temporary release programs without the written approval of the commissioner. Thus, when the Governor promulgated his Executive Order in January of this year, the Correction Law provided that inmates convicted of violent felonies, with the exception of those convicted of homicide or sex-related offenses, were eligible for participation in temporary release programs if they were within 18 months of their parole or conditional release eligibility date.
*334 Petitioners’ principal argument is that the Governor exceeded his authority and impermissibly exercised legislative power when he sought to change the definition of "eligible inmate” by Executive Order. In essence, petitioners argue that the issuance of Executive Order No. 5 violates the doctrine of separation of powers. The separation of powers principle is " 'implied by the separate grants of power to each of the coordinate branches of government’ ” (Bourquin v Cuomo, 85 NY2d 781, 784, quoting Clark v Cuomo, 66 NY2d 185, 189). The executive power, which is vested in the Governor (see, NY Const, art IV, § 1), is extremely broad. Further, the Court of Appeals has repeatedly recognized that "some overlap between the three separate branches does not violate the constitutional principle of separation of powers” (Clark v Cuomo, supra, at 189) and that "the duties and powers of the legislative and executive branches cannot be neatly divided into isolated pockets” (Bourquin v Cuomo, supra, at 784; see also, Under 21 v City of New York, 65 NY2d 344, 356). However, the Court of Appeals has also reaffirmed that the principle of separation of powers requires that "no one branch be allowed to arrogate unto itself powers residing entirely in another branch” (Under 21 v City of New York, supra, at 356). In determining whether executive action crosses the line and constitutes an inappropriate assumption of legislative power, the Court of Appeals has looked to whether the executive action "create[s] a different policy, not embraced in the legislation” or whether the executive action is in fact inconsistent with existing State law (Matter of Broidrick v Lindsay, 39 NY2d 641, 646-648; see also, Matter of Citizens For Orderly Energy Policy v Cuomo, 78 NY2d 398, 410 ["only executive acts inconsistent with or arrogative of the Legislature’s prerogatives violate the separation of powers doctrine”]).
In this case, Correction Law § 851 (2) clearly sets forth the eligibility requirements for the temporary release program. As noted above, inmates who were convicted of certain specified violent felonies involving "the use or threatened use of a deadly weapon or dangerous instrument” are eligible to apply for the program once they reach 18 months of their parole or conditional release eligibility date. The statute also provides that otherwise eligible inmates who are under sentence for crimes involving either the infliction of serious physical injury upon another as defined in the Penal Law or any other offense involving the use or threatened use of a deadly weapon requires the written approval of the commissioner before they may par *335 ticipate in the temporary release program. The Legislature has thus made the decision to attach special conditions to the participation of inmates convicted of violent felonies in the temporary release program, but has not excluded this category of inmates from the program entirely. It should be noted that the Correction Law was extensively amended only one year ago to provide that inmates convicted of homicide or sex-related offenses were no longer eligible to participate in the program and to shorten the eligibility period for violent felons to 18 months before their conditional release date, as opposed to the two years applicable to other inmates.
Respondents argue strenuously that participation in the temporary release program is a privilege, not a right (Correction Law § 855 [9]) and that the Correction Law gives the commissioner extremely broad authority to administer the temporary release program. Respondents are correct that the Correction Law gives the commissioner extensive discretion in the oversight of the temporary release program. Correction Law § 852 (1) gives the commissioner authority to promulgate rules and regulations for the administration of the temporary release program and requires that the commissioner be "guided by consideration for the safety of the community and the welfare of the inmate” in carrying out this function. The regulations promulgated by the commissioner elaborate on this standard and provide that "[ijnmates should be denied temporary release if their presence in the community or in minimum security institutions would pose an unwarranted threat to their own or public safety, if public reaction is such that the inmate’s successful participation in the program would be made difficult and public acceptance of the temporary release program would be jeopardized, or if there is substantial evidence to indicate that the inmate cannot successfully complete his requested temporary release program” (7 NYCRR 1900.4 [l] [4]). The Correction Law provides specifically that any superintendent of a facility, upon recommendation of the temporary release committee, the commissioner, the chairman of the State Board of Parole or his or her designee, can terminate any inmate’s participation in a temporary release program in accordance with applicable regulations (Correction Law § 855 [9]). The regulations identify a number of "indicators” that may demonstrate unsuitability for continued participation in the program, including threats made against others, violation of department rules, arrest and/or conviction for crimes committed while participating in the program, and *336 changes in the inmate’s physical or mental status (7 NYCRR 1904.1 [c]). The standard for judicial review of these determinations is extremely deferential; courts look to whether the State respondents have violated any positive statutory requirement or denied a constitutional right of the inmate and whether the respondents’ determination is "affected by irrationality bordering on impropriety” (Matter of Hoffman v Wilson, 86 AD2d 735). Further, as noted above, the Legislature has seen fit to condition the participation of certain violent felons in temporary release upon written approval by the commissioner.
Although this court agrees with respondents that the Correction Law gives the commissioner extensive authority to oversee the administration of the temporary release program, this in and of itself does not address the separation of powers concerns identified by the petitioners. The Correction Law, while giving the commissioner broad discretion to make case-by-case determinations regarding participation in the temporary release program, also establishes the parameters within which the commissioner must operate. Thus, under the statute as written, the commissioner may choose not to permit a certain inmate to participate in the program because he is of the opinion, in the exercise of his discretion, that to permit such participation would be contrary to the interests of public safety. It is well within the authority of the commissioner to make such a determination, and indeed the statute contemplates that the commissioner will make such determinations and the courts give substantial deference to those determinations. However, the Executive Order by its own terms simply precludes the commissioner from exercising any discretion concerning the participation of violent felons in the temporary release program, despite the fact that the Legislature explicitly confers this discretion upon the commissioner.
By eliminating violent felons as a class from future participation in the program, the Executive Order directly conflicts with the statutory eligibility requirements set forth in Correction Law § 851. The Correction Law provides that a certain class of inmates is eligible to apply for the temporary release program and the Governor has, by Executive Order, nullified the statutory definition of eligibility and substituted one of his own. Although this court certainly cannot take issue with the policy goals identified in the Executive Order— protecting the citizens of this State from crime and violence— this court is compelled to conclude that the Governor has invaded the province of the Legislature by seeking to impose *337 by Executive Order restrictions on the temporary release program that are inconsistent with eligibility requirements clearly set forth in the Correction Law. Further, the commissioner is certainly empowered, by virtue of the applicable provisions of the Correction Law, to refuse to approve the participation of any violent felon in the program if he believes that approval would constitute a threat to public safety. However, because Executive Order No. 5 is fundamentally inconsistent with Correction Law § 851, this court must conclude that its issuance violates the principle of separation of powers and that it is, consequently, unconstitutional.
Bourquin v Cuomo (85 NY2d 781, supra), cited by respondents at oral argument, is not to the contrary. This case, which was decided in June of this year, is the Court of Appeals most recent consideration of the separation of powers concerns that are at the heart of the case now before this court. In Bourquin, the Court of Appeals considered whether then-Governor Mario Cuomo’s issuance of an Executive Order authorizing the creation of a private, not-for-profit corporation known as the Citizens Utility Board (CUB) violated the principle of the separation of powers. In reversing the Appellate Division and holding that the Executive Order did not violate the separation of powers principle, the Court of Appeals noted specifically that the Executive Order did not "formulate a specific policy” (supra, at 787). "Unlike the detailed and comprehensive Executive Orders and administrative regulations that this Court has struck down in the past * * * Executive Order No. 141 has no substantive content beyond that of creating the CUB itself and giving it access to State mailings for a three-year period” (supra [citations omitted]).
In this case, by contrast, Executive Order No. 5 certainly possesses "substantive content,” in the words of the Court of Appeals. Its intended effect is to block the participation of a certain category of inmates in the temporary release program, even though they are eligible for participation by statute. Unlike the Executive Order at issue in Bourquin (supra), Executive Order No. 5 does formulate a specific policy — that the release of inmates convicted of violent felonies "is a threat to public safety and welfare”. In order to effectuate that policy, the Executive Order purports to authorize the promulgation of regulations that eliminate a category of inmates from the program despite the fact that these inmates are explicitly eligible for participation by statute. Under a long line of extremely well-settled Court of Appeals precedent, this Execu *338 tive Order represents an arrogation of legislative authority in violation of the principle of the separation of powers, and is, consequently, unconstitutional. Because the emergency regulations promulgated by the commissioner in response to the Governor’s Executive Order are similarly inconsistent with the Correction Law and create a policy toward the treatment of inmates convicted of violent felonies that is not embraced by the applicable State statutes, these regulations are likewise invalid (Matter of Broidrick v Lindsay, supra, 39 NY2d, at 646, 648).
Perhaps in light of this challenge to the Executive Order, the Legislature recently enacted Senate Bill 5281, which was signed into law by the Governor on June 10, 1995 (L 1995, ch 3). As noted above, this amendment to Correction Law § 851 (2) gives the Governor the authority to exclude or otherwise limit the participation of otherwise eligible inmates in the temporary release program. However, the amendment specifically provides that it is not intended to affect the validity of prior Executive Orders limiting participation in temporary release programs. The question of whether a statute is intended to have retroactive effect is determined by the language of the statute and the intent of the legislation itself (see, Matter of Thomas v Bethlehem Steel Corp., 63 NY2d 150, 154). Here, there is no language in the statute explicitly indicating an intent that the statute should have retroactive effect. "As a general rule statutes are to be construed as prospective only in the absence of an unequivocal expression of a legislative intent to the contrary” (Murphy v Board of Educ., 104 AD2d 796, 797, affd 64 NY2d 856). In fact, if anything, the language of the statute would appear to indicate an intent that the statute have only prospective effect. Thus, this court concludes that the subsequent enactment of this amendment to Correction Law § 851 (2) does not in any way cure the constitutional defects identified above with regard to Executive Order No. 5. Rather, the statute, as amended, appears to this court simply to codify the authority of the Governor to implement future exclusions or limitations on participation in the temporary release program by Executive Order.
Having concluded that Executive Order No. 5 is constitutionally invalid and having further concluded that the amendment to the Correction Law signed into law on June 10, 1995 does not retroactively validate Executive Order No. 5, the question that remains is whether the Legislature can properly delegate to the executive branch the authority to exclude or limit the *339 participation of otherwise eligible inmates in temporary release programs. Petitioners contend that even if the Governor were to issue a new Executive Order purporting to limit the participation of violent felons in temporary release programs that this would similarly violate the principle of separation of powers because the Legislature cannot properly delegate this function to the executive branch. "Because of the constitutional provision that '[t]he legislative power of this State shall be vested in the Senate and the Assembly’ (NY Const, art III, § 1), the Legislature cannot pass on its law-making functions to other bodies * * * but there is no constitutional prohibition against the delegation of power, with reasonable safeguards and standards, to an agency or commission to administer the law as enacted by the Legislature” (Matter of Levine v Whalen, 39 NY2d 510, 515 [citations omitted]). As the Court of Appeals recently held in Boreali v Axelrod (71 NY2d 1), "the principle that the legislative branch may not delegate all of its lawmaking powers to the executive branch has been applied with the utmost reluctance” (supra, at 9), and challenges based upon this "nondelegation” argument have largely proven unsuccessful. The Court of Appeals has upheld legislative delegations of authority that are "circumscribed in only the most general of terms” (supra, at 10, citing Matter of Levine v Whalen, supra, at 516-517 [" 'protection and promotion of the health of the inhabitants of the state’ "fit and adequate” facilities]; Matter of Sullivan County Harness Racing Assn. v Glasser, 30 NY2d 269, 277 [" 'public interest, convenience or necessity’ ”; " 'best interests of racing generally’ ”]; Martin v State Liq. Auth., 15 NY2d 707, 708 ["public convenience and advantage”]). In addition, in a footnote in Boreali, the Court of Appeals noted that the United States Supreme Court had "dusted off” the nondelegation principle for a period during the 1930s in order to strike down certain New Deal legislation. The Court observed that this line of cases has in the interim "quite rightfully, fallen into disrepute” (Boreali v Axelrod, supra, at 10, n 1).
Petitioners argue that the amendment at issue here is overly vague and does not set forth any guidelines or standards to assist the Governor in exercising the delegated authority. This is not wholly true. The Legislature has not given the Governor unlimited authority to overhaul the temporary release program; his authority is limited to the issue of determining whether certain otherwise eligible inmates should nonetheless be excluded from the program. As noted above, the Legislature has indicated that the commissioner should be "guided by *340 consideration for the safety of the community and the welfare of the inmate” (Correction Law § 852 [1]) in administering the temporary release program, and the Governor will presumably take into account these same considerations in exercising the authority granted by virtue of this section. Further, in Boreali (supra), the Court of Appeals indicated its disapproval of the "nondelegation” line of cases, and, additionally, has repeatedly upheld broad delegations of legislative authority. In short, given the weight of Court of Appeals authority in this area, this court concludes that Senate Bill 5281, signed into law on June 10, 1995, does not represent an unconstitutional delegation of legislative authority.
This being said, however, the court considers this to be a very close case. The standards set forth to guide the Governor in the exercise of his executive authority are skeletal at best. It would have been preferable for the Legislature itself to rewrite the definition of "eligible inmate” rather than to leave this matter to be addressed by the Governor. However, to paraphrase the Court of Appeals recent decision in Bourquin v Cuomo (supra), the question whether the Legislature properly delegated this function to the Governor is not a question of preference, but one of constitutionality. On balance, this court finds that the amendment to the Correction Law at issue here does not violate the principle of the separation of powers.
As noted above, the Governor has not yet issued a second Executive Order pursuant to the authority granted by this statute. However, this court expects that in light of this decision striking down Executive Order No. 5 but sustaining the subsequent legislation, the Governor will shortly issue a new Executive Order similar to the first. The court has already indicated that participation in the temporary release program is a privilege, not a right. Although the only restrictions currently in place with regard to the temporary release program are those currently contained in Correction Law § 851, this court would like to make clear that this decision is not intended to create any new "right” to participate in the program for any inmates affected by the court’s decision.
One last matter remains to be addressed, however. Petitioners Antoinette Ferrer and Miriam Rodriguez were approved for the program prior to the issuance of Executive Order No. 5. After the issuance of the order both were informed that they were no longer eligible for the program. They contend that the regulations promulgated pursuant to the Executive Order are inconsistent with the Executive Order in that they did not *341 expressly exempt inmates already approved for the program from the new eligibility requirements. The Executive Order, while not referring specifically to inmates already approved for participation, did state that the regulations to be promulgated by the commissioner should address "future transfer” into the temporary release program. Petitioners contend that this demonstrates an intent that inmates already approved for participation in the program be exempt from the change in eligibility requirements. As noted above, this court’s invalidation of Executive Order No. 5 and of the regulations promulgated thereunder renders this argument moot. However, as the Governor will presumably issue a new Executive Order, leading to the promulgation of new regulations, this court wishes simply to register its concerns about the fairness of excluding from temporary release programs inmates previously approved for such programs. Even if temporary release is a privilege and not a right, it is this court’s perception that excluding previously approved inmates from the program implicates due process concerns. Although it is well settled that the ex post facto doctrine does not apply to the temporary release program (see, e.g., People v Miller, 79 AD2d 687, 688, cert denied 452 US 919), at least one Federal court has held that while the State can change its law regarding the eligibility of inmates already in the program, "a Due Process hearing is required before inmates already participating in or approved for the program may be removed * * * Due Process requires a reevaluation by the commissioner of each participating inmates’ eligibility in light of the threat that the inmate presents to the security of the community * * * taking into account his eligibility for parole, his past institutional record, the particular circumstances underlying the violent offense for which he is under sentence, and his previous temporary release record” (Tracy v Salamack, 572 F2d 393, 396-397 [emphasis added]).
Cases involving removal of inmates from the program because they have been denied parole while participating in the program are instructive. As here, an inmate denied parole while on temporary release undergoes a change in eligibility status, as the statute defines eligibility based upon whether the inmate is within a certain period of his or her parole or conditional release eligibility date. Although cases hold that an inmate already participating in the program can be removed if he or she is denied parole (see, e.g., People ex rel. Feliciano v Waters, 99 AD2d 850), Correction Law § 851 (2) provides that "[i]n any case where an inmate is denied release *342 on parole while participating in a temporary release program, the department shall review the status of the inmate to determine if continued placement in the program is appropriate.” The commissioner’s regulations additionally provide that "[w]hen * * * the temporary release committee is reviewing an inmate’s appropriateness for continued participation in a temporary release program, the temporary release committee shall conduct a full hearing to ensure that the inmate has been afforded due process” (7 NYCRR 1904.2 [l]; see also, 7 NYCRR 1904.5). It is the opinion of this court that due process mandates a similar hearing and review process for those petitioners approved for the program who were nonetheless denied participation because of a change in their eligibility status. Fundamental fairness would dictate that the government should not take away what has already been given without at a minimum affording a hearing to ensure that due process requirements have been satisfied.