**Ronald ROUCCHIO, Plaintiff,**

v.

**Thomas A. COUGHLIN, III, "John" Lester, James F. Recore, Bruce Yelich, Edward Delph and Charles Hernandez, Defendants.**

No. 94–CV–4313 (JS).

United States District Court,
E.D. New York.

April 15, 1996.

---

**2.** Three other conditions were imposed, but are not at issue herein.

Ronald Roucchio, Astoria, NY, pro se.

Attorney General of the State of New York by Joan M. Cresap, and Nancy Miller Lerner, Assistant Attorney Generals, New York City, for Defendants.

## MEMORANDUM AND ORDER

SEYBERT, District Judge:

Plaintiff Ronald Roucchio, proceeding *pro se*, brings this action pursuant to 42 U.S.C. § 1983 to recover damages from several state officials connected with the administration or oversight of the work release program at Queensboro Correctional Facility, where plaintiff previously was incarcerated. The plaintiff, who is presently out on parole, alleges that he was deprived of his right to procedural due process, in violation of the Fourteenth Amendment, through the State's revocation of his right to participate in a work release program without permitting him an opportunity to be heard until approximately seven months later.

Pending before the Court are two separate motions. First, the defendants move, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the plaintiff's complaint in its entirety for failure to state a claim; alternatively, the defendants move for summary judgment pursuant to Fed.R.Civ.P. 56. Second, the plaintiff cross-moves for summary judgment against each of the defendants. For the reasons that follow, both of these motions are denied in their entirety.

## FACTUAL BACKGROUND

The following facts are undisputed, except as where otherwise noted.

At the time of the events in suit, plaintiff was a participant in the work release program at Queensboro Correctional Facility. Plaintiff commenced participation in the work release program in June of 1990, and until the events in question transpired, his performance was "satisfactory."

While on work release, plaintiff was arrested on March 13, 1991 for driving while intoxicated, driving without a license, and speeding. Plaintiff, however, did not notify the work release authorities of his arrest. Rather, correctional authorities did not learn of his arrest until September 11, 1991, whereupon a parole officer issued an "inmate misbehavior report" charging the plaintiff with violating the rules and regulations of the temporary release program in connection with the circumstances attending his arrest, his failure to notify work release authorities of this arrest, and for driving a car without permission. On October 17, 1991, plaintiff pled guilty to the traffic infraction of operating a motor vehicle while impaired by the consumption of alcohol, in violation of section 1192(1) of the New York Vehicle and Traffic Law. *See* Lerner Aff., Ex. A, at 9; N.Y.Veh. & Traf.Law § 1192(1) (McKinney 1986) (describing a violation of this subsection as a "traffic infraction"); *see also* N.Y.Veh. and Traf.Law § 155 (McKinney 1986 & Supp. 1996) ("A traffic infraction is not a crime and the punishment imposed therefor shall not be deemed for any purpose a penal or criminal punishment....").

Immediately upon the issuance of the inmate behavior report, plaintiff was placed in segregated confinement in the Special Housing Unit at the Queensboro Correctional Facility [the "SHU"]. Plaintiff remained in the SHU, without being afforded an opportunity to be heard, for 47 days, until October 28, 1991. As a result of his segregated confinement, plaintiff was prohibited from going to work. *See* Pl.'s Supp.Aff., at 2 (Docket # 18).

On October 22, 1991, the Temporary Release Committee met to review and evaluate the plaintiff's conduct. A separate disciplinary hearing was not held in tandem with this proceeding. Meeting without the plaintiff in attendance, the Temporary Release Committee recommended that plaintiff be removed from the Queensboro work release program. The committee report was approved by the Superintendent of the facility on October 26, 1991. This decision subsequently was affirmed by the New York State Director of Temporary Release Programs.

On October 28, 1991, in light of the Superintendent's decision removing the plaintiff from the Queensboro work release program, plaintiff was transferred from the Queensboro Correctional Facility to the Fishkill Correctional Facility, where he awaited a final transfer to the Franklin Correctional Facility.

By petition dated January 22, 1992, plaintiff instituted a proceeding pursuant to Article 78 of the New York Civil Practice Law & Rules challenging his removal from the work release program [the "Article 78 proceeding"]. In the notice of petition, plaintiff claimed, among other things, that his "right to due process, as provided for by the constitutions of this state and of the United States of America was violated" because he did not receive a hearing before the Temporary Release Committee prior to his formal removal from the work release program. Lerner Aff., Ex. A, at 2.

On or about April 17, 1992, the plaintiff was notified that a hearing had been scheduled for April 22, 1992 to consider his removal from the work release program. The plaintiff, however, refused to attend the hearing. *See* Compl. at 4. This hearing was then conducted in plaintiff's absence on April 23, 1992. As a result of this hearing, it was again determined that plaintiff should be removed from the work release program.

By decision dated June 18, 1992, the Supreme Court, Queens County, dismissed plaintiff's Article 78 petition on the ground that plaintiff's "removal from the work release program was lawful." *Roucchio v. Coughlin,* slip op., at 2 (Sup.Ct. Queens County June 18, 1992) (Lerner Aff., Ex. D). The court found that the plaintiff had been transferred out of Queensboro Correctional Facility on October 4, 1991, and that on October 22, 1991 the Temporary Release Committee at Queensboro convened in the plaintiff's absence "although the committee report indicates otherwise." *Id.* at 1. The court concluded, however, that "[i]f the [plaintiff] was initially removed from the work release program without being accorded those hearings required by regulation (*see* NYCRR § 1904.2), the respondent remedied this omission by providing the [plaintiff] with

an opportunity to appear for a removal hearing in April 1992." *Id.* at 2.

On July 6, 1992, plaintiff appealed the judgment of the Supreme Court to the Appellate Division, Second Department. While this appeal was pending, the plaintiff was released on parole. On October 17, 1994, the Second Department unanimously affirmed the dismissal of the petition, finding that the plaintiff "failed to establish that the respondent violated any statutory requirement or denied his constitutional rights in reaching his determination." *Roucchio v. Coughlin,* 208 A.D.2d 749, 618 N.Y.S.2d 548 (2d Dep't 1994) (Lerner Aff., Ex. I).

On September 13, 1994, plaintiff commenced the present action alleging that the defendants, by removing him from the work release program, violated his due process rights because he was not provided any notice of the October 22, 1991 hearing that resulted in his formal removal from the program.

The defendants now move to dismiss plaintiff's complaint, and alternatively move for summary judgment, while the plaintiff has cross-moved for summary judgment. The defendants set forth three arguments in support of their application. First, the defendants contend that the plaintiff fails to state a cause of action under 42 U.S.C. § 1983 because he is unable to establish the existence of a liberty interest of which he was deprived. Second, the defendants assert that, having been accorded a full and fair opportunity to litigate substantially identical claims in an Article 78 proceeding, the plaintiff is barred by the doctrines of res judicata and collateral estoppel from bringing the present action before this Court. Finally, defendant Coughlin, the Commissioner of the New York State Department of Correctional Services at the time of the events in suit, argues that the plaintiff fails to allege his personal involvement in a constitutional deprivation.

The plaintiff, meanwhile, in addition to opposing the defendants' contentions, asserts that the facts of this case are uncontroverted, and cross-moves for summary judgment on the ground that the defendants' conduct in

removing him from the work release program without a hearing deprived him of a constitutionally protected interest without due process of law.

## DISCUSSION

### I. Treatment of Exhibits Attached to Defendants' Motion to Dismiss

■ As an initial matter, the defendants, in their moving papers, raise a question concerning the Court's treatment of certain matters of public record relating to the plaintiff's Article 78 proceeding in the New York State courts that the plaintiff has referred to in his complaint, but has not attached as exhibits to his complaint. These items include the applications, briefs and documents submitted to the New York State courts, as well as the decisions of the New York State courts, in connection with the plaintiff's Article 78 proceeding and subsequent appeal to the Appellate Division. The defendants have submitted these items as exhibits in support of their motion to dismiss, and contend that the Court may consider them either pursuant to Fed.R.Civ.P. 10(c), as having been incorporated by reference into the plaintiff's complaint,[1] or by converting the defendants' motion into an application for summary judgment pursuant to Fed.R.Civ.P. 56. The latter conversion procedure is set forth under Fed.R.Civ.P. 12(b), which states, in pertinent part:

> If, on a motion [pursuant to Fed.R.Civ.P. 12(b)(6) ] matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Fed.R.Civ.P. 12(b). In connection with the Court's treatment of this matter, the Court observes that the plaintiff has cross-moved for summary judgment, and contends that the facts of this case are uncontroverted. *See* Pl.'s Mem. of Law, at 16 (Docket # 12).

It is well established that when a "plaintiff fails to introduce a pertinent document as part of his pleading, [a] defendant may introduce the exhibit as part of his motion attacking the pleading." 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure: Civil 2d § 1327, at 762–63 (1990). In *Cortec Industries v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir.1991), *cert. denied*, 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992), the Second Circuit Court of Appeals reaffirmed that the submission of documents referred to in the complaint as exhibits in support of a Rule 12(b)(6) motion is not considered reliance on outside materials so as to require the recharacterization of a motion to dismiss as one seeking summary judgment. *See id.* at 47–48. The Second Circuit, in *Cortec*, further noted that a court may consider documents annexed to the movant's papers which, although not annexed to the complaint, plaintiff either had "in [his] possession or had knowledge of and upon which [he] relied in bringing suit." *Id.* at 48.

In the present case, the plaintiff has not objected to the defendants' submission of the court documents pertaining to the Article 78 proceeding; indeed, in cross-moving for summary judgment, the plaintiff contends that the facts of this case are uncontroverted. Further, the Court observes that judicial notice of the annexed court documents is appropriate, because they are a matter of public record, and the accuracy of the copies submitted has not been disputed by the plaintiff. Thus, the subject documents are properly regarded as having been incorporated by reference into the complaint itself "because there was undisputed notice to [the] plaintiff[ ] of their contents and they were integral to [plaintiff's] claim." *Id.* Accordingly, the Court will consider these exhibits on defendants' motion to dismiss the complaint.

■ A further preliminary question arises as to whether the Court should treat the

1. Entitled "Adoption by Reference; Exhibits," Rule 10(c) provides as follows:

> Statements in a pleading may be adopted by reference in a different part of the same pleading or in another pleading or in any motion. A

copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes.
Fed.R.Civ.P. 10(c).

defendants' motion as seeking summary judgment, in addition to dismissal under Fed. R.Civ.P. 12(b)(6), because the plaintiff, himself, has cross-moved for summary judgment asserting that no material facts are in dispute. The Court declines, however, to accord this treatment to the defendants' motion inasmuch as the plaintiff is proceeding *pro se*, and therefore should not be deemed to have knowingly waived his right to present additional evidence—in the event the complaint survives the defendants' motion to dismiss—simply because he has brought a cross-motion for summary judgment. *Cf. Kopec v. Coughlin*, 922 F.2d 152, 155 (2d Cir.1991) (district court erred in converting defendant's motion to dismiss into one for summary judgment without giving plaintiff notice and an opportunity to offer evidence to controvert that submitted by defendant); *Ortiz v. Cornetta*, 867 F.2d 146, 148 (2d Cir. 1989) (where motion to dismiss is treated as one for summary judgment, *pro se* plaintiff must be afforded a reasonable opportunity to present all relevant material). Thus, as long as plaintiff's complaint is able to withstand the defendants' Rule 12(b)(6) motion, the Court will cease to consider the defendants' offensive posture, and will turn to address the plaintiff's cross-motion for summary judgment.

## II. Standards Governing Rule 12(b)(6) Motion to Dismiss

■ A district court should grant a motion to dismiss under Rule 12(b) of the Federal Rules of Civil Procedure only if "·'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 249–50, 109 S.Ct. 2893, 2906, 106 L.Ed.2d 195 (1989) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984)). In applying this standard, a district court must "read the facts alleged in the complaint in the light most favorable" to the plaintiff, and accept these allegations as true. *Id.* at 249, 109 S.Ct. at 2906; *see Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *see also Leatherman v. Tarrant County Narcotics Intelligence and Coordina-*

*tion Unit*, 507 U.S. 163, 168, 113 S.Ct. 1160, 1163, 122 L.Ed.2d 517 (1993) (citing Fed. R.Civ.P. 8(a)(2) to demonstrate liberal system of 'notice pleading' employed by the Federal Rules of Civil Procedure). In addition, the Supreme Court has instructed that where, as in this case, the plaintiff is proceeding *pro se*, the district court must liberally construe the complaint's allegations. *See Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972).

## III. Sufficiency of Plaintiff's Claims under 42 U.S.C. § 1983

. The defendants assert that the plaintiff's complaint must be dismissed in its entirety because it fails to state a claim under 42 U.S.C. § 1983.

■ 42 U.S.C. § 1983 allows an individual to bring suit against persons who, under color of state law, have caused him to be "depriv[ed] of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir.1993) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816, 105 S.Ct. 2427, 2432, 85 L.Ed.2d 791 (1985)), *cert. denied*, —— U.S. ——, 114 S.Ct. 2749, 129 L.Ed.2d 867 (1994). In order to state a claim cognizable under section 1983, "'a plaintiff must allege (1) that the challenged conduct was attributable at least in part to a person acting under color of state law, and (2) that such conduct deprived the plaintiff of a right, privilege or immunity secured by the Constitution or laws of the United States.'" *Eagleston v. Guido*, 41 F.3d 865, 876 (2d Cir.1994) (quoting *Dwares v. City of New York*, 985 F.2d 94, 98 (2d Cir.1993)), *cert. denied*, —— U.S. ——, 116 S.Ct. 53, 133 L.Ed.2d 18 (1995).

■ The first step in analyzing a § 1983 claim is to identify the specific federal right allegedly infringed. *See Albright v. Oliver*, 510 U.S. 266, ——, 114 S.Ct. 807, 811, 127 L.Ed.2d 114 (1994). In the instant case, the plaintiff asserts that he was deprived of his

Fourteenth Amendment right to procedural due process as a result of the defendants' failure to afford him a timely opportunity to be heard in connection with his removal from the work release program. Otherwise stated, plaintiff alleges that the defendants deprived him of a liberty interest in his continued participation in the work release program without affording him constitutionally sufficient procedures.

The Fourteenth Amendment provides in part that no State shall "deprive any person of life, liberty, or property, without due process of law...." U.S. Const. amend. XIV, § 1. This component, otherwise known as the safeguard of procedural due process, "protects 'the individual against arbitrary action of government.'" *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 460, 109 S.Ct. 1904, 1908, 104 L.Ed.2d 506 (1989) (quoting *Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974)). As the Supreme Court has explained, procedural due process questions are analyzed in two steps:

> the first asks whether there exists a liberty or property interest which has been interfered with by the State, *see Board of Regents v. Roth*, 408 U.S. 564, 571, 92 S.Ct. 2701, 2706 [33 L.Ed.2d 548] (1972); the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient. *See Hewitt v. Helms*, 459 U.S. 460, 472, 103 S.Ct. 864, 871 [74 L.Ed.2d 675] (1983). The types of interests that constitute "liberty" and "property" for Fourteenth Amendment purposes are not unlimited; the interest must rise to more than "an abstract need or desire," *Board of Regents*, 408 U.S. at 577, 92 S.Ct. at 2709, and must be based on more than "a unilateral hope." *Connecticut Bd. of Pardons v. Dumschat*, 452 U.S. 458, 465, 101 S.Ct. 2460, 2464 [69 L.Ed.2d 158] (1981). Rather, an individual claiming a protected interest must have a legitimate claim of entitlement to it.

*Kentucky Dep't of Corrections*, 490 U.S. at 460, 109 S.Ct. at 1908 (citation forms modified).

■ "Protected liberty interests 'may arise from two sources—the . Due Process Clause itself and the laws of the States.'" *Id.* (quoting *Hewitt*, 459 U.S. at 466, 103 S.Ct. at 868). In the present case, the plaintiff contends that a protected liberty interest attending his removal from the work release program may be implied under either the Due Process Clause of the Fourteenth Amendment or New York's regulations governing work release. The Court will examine each of these contentions in turn.

### A. *Inherent Liberty Interest under Due Process Clause*

■ The plaintiff contends that a liberty interest in his continued participation in the work release program arises directly under the Due Process Clause. According to the plaintiff, his participation in the work release program can be analogized to other conditional restrictions imposed upon a prisoner's freedom—such as parole, probation and conditional release programs—the revocation of which have been held to be protected by the Due Process Clause of its own force. *See, e.g., Gagnon v. Scarpelli*, 411 U.S. 778, 782, 93 S.Ct. 1756, 1760, 36 L.Ed.2d 656 (1973) (revocation of probation status); *Morrissey v. Brewer*, 408 U.S. 471, 482, 92 S.Ct. 2593, 2601, 33 L.Ed.2d 484 (1972) (revocation of parole); *Edwards v. Lockhart*, 908 F.2d 299, 302 (8th Cir.1990) (revocation of participation in program bearing many of the same characteristics as parole); *see also Harper v. Young*, 64 F.3d 563, 566–67 (10th Cir.1995) ("[A] prisoner release program which permits a convict to exist, albeit conditionally, in society on a full-time basis more closely resembles parole or probation than even the more permissive forms of institutional confinement."), *petition for cert. filed*, No. 95–1598 (U.S. Apr. 4, 1996); *United States v. Stephenson*, 928 F.2d 728, 732 (6th Cir.1991) (finding inherent liberty interest in continued placement in supervised release program that allowed convicts to live in society).

Consistent with "the necessary withdrawal or limitation of many privileges and rights" that results from a valid judgment of conviction, the Due Process Clause itself provides a prisoner with only limited procedural protections. *Sandin v. Conner*, — U.S. —, —, 115 S.Ct. 2293, 2301, 132 L.Ed.2d 418

(1995) (internal quotations omitted).[2] "Indeed, the Supreme Court has inferred inherent due process protections only in cases in which the prisoner's 'release from institutional life altogether' has been revoked, or in cases in which the restrictions imposed go beyond the original conditions of confinement." *Whitehorn v. Harrelson*, 758 F.2d 1416, 1421 (11th Cir.1985) (quoting *Hewitt*, 459 U.S. at 468, 103 S.Ct. at 869) (other citations omitted); *see Gagnon*, 411 U.S. at 782, 93 S.Ct. at 1760 (revocation of probation status); *Morrissey*, 408 U.S. at 482, 92 S.Ct. at 2601 (revocation of parole); *see also Washington v. Harper*, 494 U.S. 210, 221–22, 110 S.Ct. 1028, 1036–37, 108 L.Ed.2d 178 (1990) (independent of any state regulation, an inmate has a liberty interest in being protected from the involuntary administration of antipsychotic drugs); *Vitek v. Jones*, 445 U.S. 480, 493–94, 100 S.Ct. 1254, 1264, 63 L.Ed.2d 552 (1980) (prisoner involuntarily transferred to state mental hospital); *cf. Sandin*, — U.S. at ——, 115 S.Ct. at 2300 (citing *Vitek* and *Washington* to illustrate where the conditions of confinement exceeded the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force).

The plaintiff asserts that his participation in the work release program bears similarities to parole, and therefore is afforded protection by the Due Process Clause independent of any state regulation. According to the plaintiff, his participation in the work release program lasted approximately 15 months, from June 1990 through September 1991. When his work release program began, plaintiff lived at the Queensboro Correctional Facility. Soon afterwards, however, he was permitted to spend increasing amounts of time at home. At first, he was permitted to live at home one night a week. This allowance was then increased to two nights a week. Subsequently, he was placed on "4" and "3" status, wherein a prisoner lives outside the facility four nights a week, and sleeps at the facility three nights a week. Once he obtained a permanent job, plaintiff switched to "5" and "2" status (five nights per week at home, and two nights per week sleeping at the facility). At the time that his work release privileges were revoked, plaintiff had been on "5" and "2" status for a period of approximately thirteen months, had a full-time job, was living at home with his mother, and reported only twice a week to Queensboro Correctional Facility to sleep over and meet with his counselor. *See* Pl.'s Supp.Aff., at 1 (Docket # 18). The plaintiff argues, therefore, that these conditions mirror those of parole, and that consequently the revocation of these privileges should implicate due process safeguards.

Although the plaintiff establishes some similarities between the conditions of his work release program and parole, the differences between the two are sufficiently substantial to warrant the conclusion that his participation in the work release program is not independently protected by the Due Process Clause. Specifically, as plaintiff himself acknowledges, at the time that his work release privileges were revoked, he was on "5" and "2" status, meaning that he was required to spend two nights a week sleeping at the institution. Thus, although the plaintiff "did enjoy some conditional liberty while participating in the work release program, he had not been released from institutional life altogether." *Whitehorn*, 758 F.2d at 1421; *see Edwards*, 908 F.2d at 302. The significance of this indicia of incarceration is explained in a recent decision of the Tenth Circuit Court of Appeals:

> [T]he dispositive characteristic that marks the point at which the Due Process Clause itself implies a liberty interest ... is the fact of release from incarceration. The liberty associated with a life outside the walls of a penal facility dwarfs that available to an inmate.... It is the ability to reside in a home of one's own, without bars or fences or bonds, beyond the immediate authority of guards or wardens. The passage outside the walls of a prison does not simply alter the degree of confinement; rather, it works a fundamental change in the *kind* of confinement, a transformation

---

**2.** The Supreme Court's decision in *"Sandin* does not purport to alter the law as it pertains to those liberty interests that inhere in the Due Process Clause itself." *Harper*, 64 F.3d at 564 n. 1 (citing *Sandin*, — U.S. at —— ——, 115 S.Ct. at 2299–2300).

that signals the existence of an inherent liberty interest and necessitates the full panoply of procedural protections outlined in *Morrissey*.

*Harper v. Young*, 64 F.3d 563, 566 (10th Cir.1995) (emphasis in original), *petition for cert. filed*, No. 95–1598 (U.S. Apr. 4, 1996). Thus, courts have denied due process protection in circumstances where the restrictions imposed upon the prisoner were fairly analogous to those in the present case. *See Whitehorn*, 758 F.2d at 1421 (prisoner's removal from work release program did not trigger a liberty interest under the Due Process Clause of its own force); *Brennan v. Cunningham*, 813 F.2d 1, 5–6 (1st Cir.1987) (finding no inherent liberty interest in continued placement in work release program at an institutional halfway house). Indeed, even in *Edwards v. Lockhart*, 908 F.2d 299 (8th Cir.1990), upon which the plaintiff relies, the court, as demonstrated by the following passage, observed that had the work/study release program at issue not entailed the prisoner's release from institutional life into society, an inherent liberty interest would not have been found:

> Viewing parole and work release on a continuum, with more freedom and self-determination associated with parole and less with work release, we believe that [plaintiff's] participation in this program is more closely related to parole.... [W]e find determinative the fact that she has been released from institutional life into society.

*Id.* at 302 (citation omitted) (prisoner had inherent liberty interest in work/study release program, under which she was allowed to live outside of the institution, and, in fact, had been released from institutional life altogether); *see also Harper*, 64 F.3d at 566–67 ("[A] prisoner release program which permits a convict to exist, albeit conditionally, in society on a full-time basis more closely resembles parole or probation than even the more permissive forms of institutional confinement."); *Stephenson*, 928 F.2d at 732 (finding inherent liberty interest in continued placement in supervised release program that allowed convicts to live in society).

In the present action, although the plaintiff's work release privileges had progressed to the point where he spent five days a week outside of the facility, the Court is unable to conclude that the plaintiff was effectively released from institutional life into society so as to warrant due process protection. *See Brennan*, 813 F.2d at 5–6; *Whitehorn*, 758 F.2d at 1421. Accordingly, the Court finds that the plaintiff fails to allege a protected liberty interest arising under the Due Process Clause of its own force.

### B. State–Created Liberty Interest in Work Release

■■■ The plaintiff contends that, even assuming that he is unable to establish a liberty interest inhering under the Due Process Clause, he still succeeds in alleging a liberty interest created by New York law with respect to his removal from the work release program, and placement in a SHU for 47 days. According to the plaintiff, this liberty interest survives the Supreme Court's recent decision in *Sandin v. Conner*, —— U.S. ——, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), which dramatically narrowed the range of liberty interests that a prisoner will be able to establish under State law. Although the conduct plaintiff assails occurred in 1991, "[t]he *Sandin* decision applies retroactively" to this case. *Samuels v. Mockry*, 77 F.3d 34, 37 (2d Cir.1996) (citing *Harper v. Virginia Dep't of Taxation*, 509 U.S. 86, 95, 113 S.Ct. 2510, 2517, 125 L.Ed.2d 74 (1993); *Solem v. Stumes*, 465 U.S. 638, 642, 104 S.Ct. 1338, 1341, 79 L.Ed.2d 579 (1984)).

The defendants, in turn, contend, without regard to *Sandin*, that the plaintiff fails to allege a protected liberty interest because New York law does not confer any right upon a prisoner "to continue to participate in a temporary release program." N.Y.Correct.Law § 855(9) (McKinney 1987); 7 N.Y.Comp.Codes R. & Regs. [hereinafter "NYCCRR"] § 1904(1)(a) (1996). According to the defendants, the clear language of the applicable statute and regulations negates the plaintiff's ability to make the threshold showing that he has "a legitimate claim of entitlement" to continue to participate in a work release program. *Kentucky Dep't of*

*Corrections,* 490 U.S. at 460, 109 S.Ct. at 1908 (citing *Connecticut Bd. of Pardons v. Dumschat,* 452 U.S. 458, 465, 101 S.Ct. 2460, 2464, 69 L.Ed.2d 158 (1981); *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972)); *see Szucs v. Recore,* 209 A.D.2d 803, 618 N.Y.S.2d 473, 473 (3d Dep't 1994) ("Because temporary release is a discretionary program and a privilege, petitioner had no due process entitlement to continued participation in the program.").[3]

Much has changed in procedural due process jurisprudence during the past year. As recently as June of 1995, the law of the Second Circuit was that New York's prison regulations conferred upon an inmate a liberty interest in not being placed in a SHU, so as to trigger the procedural protections of due process. *See Wright v. Smith,* 21 F.3d 496, 499 (2d Cir.1994) (citing *Matiyn v. Henderson,* 841 F.2d 31 (2d Cir.), *cert. denied,* 487 U.S. 1220, 108 S.Ct. 2876, 101 L.Ed.2d 911 (1988)). On June 19, 1995, much of the jurisprudential landscape was leveled in light of the Supreme Court's decision in *Sandin v. Conner,* —— U.S. ——, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

In *Sandin,* a prisoner, who was serving an indeterminate sentence of 30 years to life in a Hawaii prison, brought a civil-rights action against prison officials alleging that the defendants deprived him of procedural due process when an adjustment committee refused to allow him to present witnesses during a disciplinary hearing, and then sentenced him to *disciplinary* segregation in the Special Holding Unit, for a period of 30 days, for misconduct. *See id.* at ——, 115 S.Ct. at 2296. The Supreme Court held that neither the state prison regulations nor the Due Process Clause itself afforded the plaintiff a

protected liberty interest that would entitle him to the procedural protections set forth in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). *See Sandin,* —— U.S. at ——, 115 S.Ct. at 2302.

In developing its analysis, the *Sandin* Court first noted that, under *Wolff,* States may in certain circumstances create liberty interests which are protected by the Due Process Clause. *See Sandin,* —— U.S. at ——, 115 S.Ct. at 2300. These interests, however, generally will be "limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless *imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.*" *Id.* (citations omitted) (emphasis added). According to the *Sandin* Court, the methodology used in *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), and later cases had impermissibly shifted the focus of the liberty interest inquiry from one based on the nature of the deprivation to one based on the language of a particular regulation. Under *Hewitt*'s methodology, prison regulations had been examined solely to see whether mandatory language and substantive predicates created an enforceable expectation that the State would produce a particular outcome with respect to the conditions of the prisoner's confinement. *See Sandin,* —— U.S. at —— – ——, 115 S.Ct. at 2298–99. This methodology, in turn, led courts, such as the Ninth Circuit Court of Appeals—which the Supreme Court overturned in *Sandin*—to find liberty interests to be created through the negative implications of mandatory language. *See id.* at ——, 115 S.Ct. at 2300. In

---

**3.** The defendants also rely upon case law which holds that a New York prisoner has no state-created liberty interest in the *initial determination* of whether he may participate in a work release program. *See Dugar v. Coughlin,* 613 F.Supp. 849 (S.D.N.Y.1985); *Martino v. Gard,* 526 F.Supp. 958 (E.D.N.Y.1981); *Grant v. Temporary Release Comm.,* 209 A.D.2d 617, 619 N.Y.S.2d 106 (2d Dep't 1994); *Walker v. Le Fevre,* 193 A.D.2d 982, 598 N.Y.S.2d 345 (3d Dep't 1993). These authorities are inapposite insofar as the case at bar involves the *revocation* of such privileges from an individual who has successful-

ly participated in the program for a period in excess of one year. *See Tracy v. Salamack,* 572 F.2d 393 (2d Cir.1978) (per curiam); *see also Greenholtz v. Inmates of Nebraska Penal and Correctional Complex,* 442 U.S. 1, 9, 99 S.Ct. 2100, 2105, 60 L.Ed.2d 668 (1979) ("There is a crucial distinction between being deprived of a liberty one has ..., and being denied a conditional liberty that one desires."); *Whitehorn v. Harrelson,* 758 F.2d 1416, 1422 (11th Cir.1985) (determination of initial placement in work release program, and removal of prisoner from such program, present different inquiries).

the view of the *Sandin* Court, this approach produced the undesirable effects of "creat[ing] disincentives for States to codify prison management procedures," and promoting "the involvement of federal courts in the day-to-day management of prisons...." *Id.* at ——, 115 S.Ct. at 2299.

For the foregoing reasons, the *Sandin* Court regarded the approach of *Hewitt,* both in its formulation and in its consequences, to be at variance with an analysis designed to assess the "nature" of the deprivation worked upon the inmate. *See id.* at ——, 115 S.Ct. at 2298 (citing *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972); *Board of Regents v. Roth,* 408 U.S. 564, 571, 92 S.Ct. 2701, 2706, 33 L.Ed.2d 548 (1972)). Focusing instead upon the nature of the 30 days' disciplinary confinement imposed upon the inmate in relation to his overall prison environment, the *Sandin* Court concluded that "Conner's discipline in segregated confinement did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest." *Sandin,* —— U.S. at ——, 115 S.Ct. at 2301.

■■■■■ As Justice Ginsburg aptly notes in her dissent, the majority opinion in *Sandin* leaves "consumers of the Court's work at sea ... to fathom what would constitute an 'atypical, significant deprivation,' and yet not trigger protection under the Due Process Clause directly." *Sandin,* —— U.S. at —— n. 2, 115 S.Ct. at 2303 n. 2 (Ginsburg, J., dissenting) (internal citations omitted). While jurisprudential uncertainty would appear to be unavoidable, certain themes do nevertheless emerge to guide lower courts in their application of the *Sandin* standard. First, in order for a deprivation to impose an atypical, significant hardship on the inmate relative to the ordinary incidents of prison life, it appears that a court must evaluate

whether the deprivation is consistent with the prisoner's sentence, in the sense of being reasonably foreseeable therewith, and not unexpected, as opposed to working a "major disruption" in the prisoner's environment. *Sandin,* —— U.S. at ——, 115 S.Ct. at 2301. In making this evaluation, a court should proceed objectively, taking into account the duration of the prisoner's sentence, the conditions to which the prisoner is subjected, and the extent to which the alleged loss of liberty portends a departure from the circumstances faced by other "inmates in the general population." *Id.; see id.* at —— n. 9, 115 S.Ct. at 2301 n. 9 ("[W]e do not think a prisoner's subjective expectations dispositive of the liberty interest analysis, [although] it does provide some evidence that the conditions suffered were expected within the contour of the actual sentence imposed."); *Quartararo v. Catterson,* 917 F.Supp. 919, 937 (E.D.N.Y.1996).

■■■■ Second, it does not appear that the Court, in *Sandin,* intended to depart entirely from a consideration of whether the state statute or regulation at issue is mandatory in character. While it is clear that *Sandin* rejects the drawing of negative inferences from the mandatory language of prison regulations, *see Sandin,* —— U.S. at ——, 115 S.Ct. at 2300,[4] the Court cited with approval *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), which distinguished the Court's prior decision in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), noting that in *Wolff* "the protected liberty interest in good time credit had been created by state law; [in *Meachum,* in contrast], no comparable Massachusetts law stripped officials of the discretion to transfer prisoners to alternate facilities 'for whatever reason or for no reason at all.'" *Sandin,* —— U.S. at ——, 115 S.Ct. at 2297

---

4. In *Sandin,* the decision of the Ninth Circuit Court of Appeals that the Supreme Court overturned had found the prisoner to possess a liberty interest in remaining free from disciplinary segregation. The Court of Appeals based its conclusion upon a prison regulation that instructs the adjustment committee to find guilt when a charge of misconduct is supported by substantial evidence. Reasoning that the committee's duty to find guilt was nondiscretionary, the Court of

Appeals drew a negative inference from the language of the regulation that the committee may not impose segregation if it does not find substantial evidence of misconduct. The Court of Appeals further regarded this negative implication to constitute a state-created liberty interest that entitled the prisoner to call witnesses in support of his position. *See Sandin,* —— U.S. at —— – ——, 115 S.Ct. at 2296–97.

(quoting *Meachum,* 427 U.S. at 228, 96 S.Ct. at 2540). Thus, it would appear that the methodology of *Sandin* did not seek to abandon entirely consideration of whether the state statute or regulation at issue, through its use of mandatory language and accompanying substantive predicates, served to strip officials of discretion in reaching their decision. Rather, the *Sandin* Court suggests that considerations of language remain relevant, although not of itself dispositive, and moreover, that the use of negative implication jurisprudence will no longer be permitted. Ironically, it therefore follows that, in certain instances, language which at first blush seems mandatory—that when dissected in tandem with the accompanying substantive predicates, previously had been construed by the courts to provide sufficient discretion to officials to prevent the creation of a liberty interest—now may trigger a liberty interest through a less technical reading under the *Sandin* analysis, provided that the resulting deprivation works an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at ——, 115 S.Ct. at 2300; *see Quartararo,* 917 F.Supp. at 937.

■ Applying the *Sandin* analysis to the facts of this case, it is clear to the Court that, to the extent that the plaintiff assails his segregated confinement to the SHU for a period of 47 days, such confinement, in view of the 15–years–to–life duration of his sentence, "did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest." *Sandin,* —— U.S. at ——, 115 S.Ct. at 2301. The Court observes that this determination is consistent with the weight of authority that has applied *Sandin.* *See, e.g., Frazier v. Coughlin,* 81 F.3d 313, 317–18 (2d Cir.1996) (per curiam) (confinement to SHU for 12 days does not implicate a liberty interest under *Sandin* ); *Auburn Inner City Prison Branch v. Coughlin,* No. 94–2720, 1995 WL 746638, at *1 (2d Cir. Dec. 14, 1995) (unpublished disposition) (citing *Sandin* for proposition that prisoner's constitutional rights were not violated as a result of 60 days' disciplinary confinement to a SHU); *Hutchinson v. Adorno,* No. 94–2652, 1995 WL 737493, at *1–*2 (2d Cir. Dec. 13, 1995) (unpublished

disposition) (71 days' segregated confinement did not impose an atypical and significant hardship on prisoner in relation to the ordinary incidents of prison life); *Walker v. Mahoney,* 915 F.Supp. 548, 553 (E.D.N.Y.1996) (segregated confinement for a period of 23 days does not implicate a liberty interest under *Sandin* ); *Quartararo,* 917 F.Supp. at 937 (confinement to SHU for 14 days, in and of itself, fails to trigger a liberty interest under *Sandin* in view of the 9–years–to–life duration of prisoner's sentence); *Arce v. Walker,* 907 F.Supp. 658, 662 (W.D.N.Y.1995) (confinement to SHU for 19 days, and accompanying loss of exercise privileges, fails to implicate liberty interest under *Sandin* ); *Carter v. Carriero,* 905 F.Supp. 99, 104 (W.D.N.Y.1995) (270 days' disciplinary confinement in SHU does not impose an atypical and significant hardship in relation to the ordinary incidents of prison life, and therefore does not trigger a liberty interest); *Schmelzer v. Norfleet,* 903 F.Supp. 632, 634–35 (S.D.N.Y.1995) (11 days' confinement in keeplock does not implicate liberty interest under *Sandin* ); *Malsh v. Austin,* 901 F.Supp. 757, 761 (S.D.N.Y.1995) (rescheduling of routine dental appointment does not impose an atypical or significant hardship on a prisoner so as to give rise to a liberty interest); *Maguire v. Coughlin,* 901 F.Supp. 101, 106 (N.D.N.Y.1995) (transfer of prisoner among and within four correctional facilities in the span of three weeks does not implicate a protected liberty interest); *Cody v. Jones,* 895 F.Supp. 431, 441 (N.D.N.Y.1995) (applying *Sandin,* no liberty interest triggered through failure of prison regularly to accord plaintiff (i) one hour of daily outdoor exercise for a period of several months, (ii) two meals out-of-cell per day for a period of 32 days, or (iii) three hours out-of-cell time per day for a period of 32 days); *Eastman v. Walker,* 895 F.Supp. 31, 35 (N.D.N.Y.1995) (4 days' administrative confinement does not implicate liberty interest under *Sandin* ); *Uzzell v. Scully,* 893 F.Supp. 259, 262–63 (S.D.N.Y. 1995) (placement of plaintiff in keeplock does not implicate a liberty interest under *Sandin* ); *Brooks v. Di Fasi,* No. 93–CV–0197E(H), 1995 WL 780976, at *5 (W.D.N.Y. Dec. 29, 1995) (180 days' disciplinary confine-

ment in a SHU does not implicate a liberty interest under *Sandin* ); *Jermosen v. Coughlin,* No. 81–CV–0974E(M), 1995 WL 780978, at *3 (W.D.N.Y. Dec. 29, 1995) (confinement to cell for 7 days, and loss of certain privileges for 30 days, fails to implicate liberty interest under *Sandin* ); *Rosario v. Selsky,* No. 94 Civ. 6872 (MBM), 1995 WL 764178, at *5 (S.D.N.Y. Dec. 28, 1995) (less than three months' segregated confinement failed to implicate liberty interest under *Sandin* ); *Tulloch v. Coughlin,* No. 91–CV–0211E(M), 1995 WL 780970, at *2 (W.D.N.Y. Dec. 22, 1995) (180 days' disciplinary confinement in SHU does not implicate liberty interest under *Sandin* ); *Martin v. Mitchell,* No. 92–CV–716, 1995 WL 760651, at *3 (N.D.N.Y. Nov. 24, 1995) (30 days' confinement in keeplock fails to implicate liberty interest under *Sandin* ); *Jackson v. Keane,* No. 93 Civ. 6453 (JFK), 1995 WL 622593, at *3 (S.D.N.Y. Oct. 24, 1995) (14 days' confinement, without more, under *Sandin,* doestute an atypical and significant hardship implicating a constitutionally protected liberty interest); *McMiller v. Wolf,* No. 94–CV–0623E(F), 1995 WL 529620, at *1–*3 (W.D.N.Y. Aug. 28, 1995) (confinement to SHU for 183 days as a result of alleged filing by prison official of false misbehavior report fails to implicate liberty interest under *Sandin* ); *Kozlek v. Papo,* No. 94 Civ. 1429 (DAB), 1995 WL 479410, at *1–*2 (S.D.N.Y. Aug. 11, 1995) (liberty interest not triggered as a result of prisoner's confinement for 10 days to a SHU); *see also Rodriguez v. Phillips,* 66 F.3d 470, 480 (2d Cir.1995) (not reaching question of whether prisoner's three-day detention in administrative segregation implicated a liberty interest, but noting that "*Sandin* may be read as calling into question the continuing viability of our cases holding that New York regulations afford inmates a liberty interest in remaining free from administrative segregation"); *compare Delaney v. Selsky,* 899 F.Supp. 923, 927–28 (N.D.N.Y.1995) (material question of fact as to whether 197 days' confinement to SHU implicated protected liberty interest, where the inmate alleged that the conditions of his cell caused him to sustain back problems as a result of his unusual height).

A much closer question is presented, however, with respect to plaintiff's removal from the work release program. According to the plaintiff, his participation in the work release program lasted approximately 15 months, from June 1990 through September 1991. When his work release program began, plaintiff lived at the Queensboro Correctional Facility. Soon afterwards, however, he was permitted to spend increasing amounts of time at home. At first, he was permitted to live at home one night a week. This allowance was then increased to two nights a week. Subsequently, he was placed on "4" and "3" status, wherein a prisoner lives outside the facility four nights a week, and sleeps at the facility three nights a week. Once he obtained a permanent job, plaintiff switched to "5" and "2" status (five nights per week at home, and two nights per week sleeping at the facility).[5] At the time that his work release privileges were revoked, plaintiff had been on "5" and "2" status for a period of approximately thirteen months, had a full-time job, was living at home with his mother, and reported only twice a week to Queensboro Correctional Facility to sleep over and meet with his counselor. *See* Pl.'s Supp.Aff., at 1 (Docket # 18). The plaintiff argues that the sudden revocation of these privileges worked a "major disruption" in his prison environment, *Sandin,* —— U.S. at ——, 115 S.Ct. at 2301, that imposed an atypical and significant hardship upon him in light of the legitimate expectations to which a prisoner, accorded such conditional liberty, could reasonably be expected to possess.

The Court agrees with the plaintiff's contention that an objective evaluation of the circumstances attending his participation in the work release program warrants the conclusion that the revocation of this conditional freedom, that enabled him to live five days a week outside the prison walls, worked a "major disruption" in his prison environment, *Sandin,* —— U.S. at ——, 115 S.Ct. at 2301, and imposed an "atypical and significant

---

5. According to the plaintiff, an inmate may, depending upon his job, be placed on "7" and "0" status, pursuant to which he lives permanently at home, and only reports to the facility once a week to meet with his counselor.

hardship [upon him] in relation to the ordinary incidents of prison life." *Id.* at ——, 115 S.Ct. at 2300; *see id.* at —— n. 9, 115 S.Ct. at 2301 n. 9 ("[W]e do not think a prisoner's subjective expectations dispositive of the liberty interest analysis, [although] it does provide some evidence that the conditions suffered were expected within the contour of the actual sentence imposed."); *Quartararo*, 917 F.Supp. at 940 ("Indeed, it impresses the Court that the removal of a prisoner from a work release program in which he has been gainfully employed imposes an atypical, significant hardship upon the prisoner relative to the ordinary incidents of prison life, and constitutes a substantial disruption of his environment."); *see also Gotcher v. Wood*, 66 F.3d 1097, 1100–01 (9th Cir.1995) (state-created liberty interest in receiving credit for good conduct survives *Sandin*, despite policy statement of Department of Corrections indicating specific intent of the State of Washington not to confer a liberty interest upon prisoners through this scheme), *petition for cert. filed*, 64 U.S.L.W. 3605 (U.S. Feb. 26, 1996); *compare Frazier v. Coughlin*, 81 F.3d 313 (2d Cir.1996) (per curiam) (under *Sandin*, prisoner has no liberty interest in an in-prison job assignment in the prison laundry); *Bulger v. United States Bureau of Prisons*, 65 F.3d 48, 49 (5th Cir.1995) (under *Sandin*, prisoner has no liberty or property interest in an in-prison job assignment); *Rucker v. Tirone–Curtiss*, No. 93–CV–834H, 1995 WL 818661, at *6 (W.D.N.Y. Dec. 21, 1995) (Segregated confinement for 6 days which had the effect of temporarily removing a prisoner from a work release program does not implicate a liberty interest under *Sandin* where the prisoner subsequently was returned to work release status, because such circumstances did not constitute a major disruption in the prisoner's environment.). *But see Dominique v. Weld*, 73 F.3d 1156, 1160 (1st Cir. 1996) (removal of prisoner from work release program, after having participated in such program for almost four years, does not implicate a liberty interest under *Sandin*); *Grennier v. Nagle*, 73 F.3d 364, No. 94–3838, 1995 WL 767897, at *1 (7th Cir. Dec. 28, 1995) (unpublished disposition) (prisoner's removal from work release program did not trigger a liberty or property interest under *Sandin*), *petition for cert. filed*, No. 95–8407 (U.S. Mar. 25, 1996); *Hamilton v. Peters*, 919 F.Supp. 1168, 1172 (N.D.Ill.1996) (finding no liberty interest under *Sandin* attending the revocation of work release status, focusing its analysis upon the prisoner's change in facility).[6]

In reaching its determination, the Court observes that prior to *Sandin*, the Second Circuit Court of Appeals, in *Tracy v. Salamack*, 572 F.2d 393, 396 (2d Cir.1978) (per curiam), held that the State of New York, in establishing the Temporary Release Program existing at that time, created a liberty interest that may not be terminated without an individualized due process hearing. *See Severino v. Negron*, 996 F.2d 1439, 1442 (2d Cir.1993) (per curiam) ("[I]t has been clear

---

**6.** In this Court's view, the courts in *Dominique*, *Grennier*, and *Hamilton*, cited in the text above, undervalue the extent to which an inmate's environment is disrupted through the revocation of a conditional freedom outside the prison walls that he or she enjoys. Indeed, as the Supreme Court has stated—in an observation that was not called into question by *Sandin*—"[t]here is a crucial distinction between being deprived of a liberty one has ..., and being denied a conditional liberty that one desires." *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1, 9, 99 S.Ct. 2100, 2105, 60 L.Ed.2d 668 (1979); *see Whitehorn v. Harrelson*, 758 F.2d 1416, 1422 (11th Cir.1985) (determination of initial placement in work release program, and removal of prisoner from such program, present different inquiries). Moreover, the First Circuit's concern, as stated in *Dominique*, that "a liberty interest might be claimed whenever authorities or the state legislature decided to eliminate or cut back work release programs," *Dominique*, 73 F.3d at 1160, is somewhat inconsistent with Second Circuit law, which recognizes that an entitlement rooted in state law does not "have the substantive effect of prohibiting alteration of the underlying law which creates the entitlement." *Tracy v. Salamack*, 572 F.2d 393, 396 (2d Cir. 1978) (per curiam).

Finally, as is further discussed in the text, *see infra* This Part, application of the Supreme Court's instructions in *Sandin* to return to a pre-*Hewitt* liberty interest analysis necessarily leads this Court to apply, as binding precedent, the Second Circuit's 1978 decision in *Tracy v. Salamack*, 572 F.2d 393 (2d Cir.1978) (per curiam), which found a state-created liberty interest to be implicated through a prisoner's removal from a work release program.

since *Tracy* that a liberty interest exists [in an inmate's continued participation] in a work release program....").  In an effort to call into question the continuing vitality of *Tracy*, the defendants direct the Court's attention to the vast discretion that New York law confers upon state officials in deciding whether to remove a participant from a work release program.[7]  *See* N.Y.Correct.Law § 855(9) (McKinney 1987);[8] 7 NYCCRR § 1904(1)(a) (1996);[9] *see also Szucs v. Recore,* 209 A.D.2d 803, 618 N.Y.S.2d 473, 473 (3d Dep't 1994) ("Because temporary release is a discretionary program and a privilege, petitioner had no due process entitlement to continued participation in the program.").  As is the case in the present action, however, the statute governing temporary release programs, including work release, at the time of *Tracy* explicitly provided that participation therein was a privilege which could be revoked at any time.  *See Tracy,* 572 F.2d at 396 n. 10 (noting that despite language of "privilege" appearing in the statute and in the form agreement signed by each enrolling participant, the district court correctly concluded that an entitlement had been created because the reasonable expectation of the inmate was that he or she would be allowed to continue in the program absent misbehavior; such conclusion was reinforced in light of the State's practice to revoke temporary release status only for misbehavior); *see also Dorst v. Pataki,* 167 Misc.2d 329, 633 N.Y.S.2d 730, 737–38 (Sup.Ct. Albany County 1995) (citing *Tracy* and requiring a hearing where prisoners approved for temporary release program were denied participation because of change in their eligibility status).  Further, because the *Tracy* decision was issued in 1978, there is no basis for the defen-

dants to contend that the Second Circuit, in *Tracy,* followed the methodology of *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), and more prominently, of *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), which the Supreme Court disavowed in *Sandin.*

The defendants also rely upon *Klos v. Haskell,* 48 F.3d 81, 88 (2d Cir.1995)—which the Supreme Court itself cited with approval in *Sandin,* —— U.S. at —— – ——, 115 S.Ct. at 2299–2300—which held that no hearing is required prior to an inmate's removal from a "shock incarceration program," a form of boot camp for inmates.  The defendants fail to consider, however, that the Second Circuit, in *Klos,* distinguished *Tracy* in view of the State's ambiguity, in *Tracy,* in communicating, through a memorandum given to the prisoners, the extent of the prison officials' discretion with respect to inmates' continued participation in the work release program.  *See Klos,* 48 F.3d at 88.  Further, the defendants do not argue that the analysis set forth in *Tracy* should not apply on the ground that the communications, both formal and informal, between the work release officials and the plaintiff were unambiguous in delineating the extent of the prison officials' discretion.  In any event, if the defendants sought to introduce such evidence, the Court would be unable to consider it on a motion to dismiss.  Rather, any such evidence submitted to negate the presence of a liberty interest would necessarily await consideration on a subsequent motion for summary judgment so as to allow the plaintiff to offer evidence concerning the State's practices in administering the work release program.  *See Klos,*

7. The defendants do not specifically argue that the continuing vitality of *Tracy* is called into question by *Sandin.*

8. Section 855(9) of the New York Correction Law provides, in pertinent part, as follows:

Participation in a temporary release program shall be a privilege.  Nothing contained in this article may be construed to confer upon any inmate the right to participate, or to continue to participate, in a temporary release program. N.Y.Correct.Law § 855(9) (McKinney 1987).

9. 7 NYCCRR § 1904(1)(a) provides as follows:

Participation in the temporary release program is a privilege. *An inmate does not have the right* to participate, or *to continue to participate, in the temporary release programming.*  A superintendent may at any time revoke an inmate's participation in the temporary release program, and upon the recommendation of the temporary release committee, the commissioner, or the chairman of the board of parole or his designee, shall revoke an inmate's privilege to participate in the temporary release program.
7 NYCCRR § 1904(1)(a) (1996) (emphasis added).

48 F.3d at 87 (Whether inmate's expectation of continued participation in program was "'justifiable,' ... depends on the statute, regulations, and *practice* of New York State concerning the rights of inmates within the program...." ) (emphasis added). Accordingly, the plaintiff succeeds in alleging that he was deprived of a state-created liberty interest in his continued participation in the work release program.

## IV. Preclusion of Claims by Res Judicata and Collateral Estoppel

The defendants move to dismiss the plaintiff's complaint on the grounds of res judicata and collateral estoppel, and assert that the plaintiff is now seeking his "second bite at the apple" in the present action, having previously litigated issues related to his removal from the work release program in an Article 78 proceeding instituted in the New York State courts. The Court will address each of these doctrines in turn.

### A. *Res Judicata*

■ Under the Full Faith and Credit Clause of the Constitution, U.S. Const. art. IV, § 1, a federal court must give the same preclusive effect to a state court judgment "as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist.*, 465 U.S. 75, 81, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984); *see* 28 U.S.C. § 1738 (implementing the Full Faith and Credit Clause). New York courts have adopted the 'transactional approach' to res judicata, or claim preclusion, "holding that if claims arise out of the same 'factual grouping' they are deemed to be part of the same cause of action and the later claim will be barred without regard to whether it is based upon different legal theories or seeks different or additional relief." *Davidson v. Capuano*, 792 F.2d 275, 278 (2d Cir.1986) (citing *Smith v. Russell Sage College*, 54 N.Y.2d 185, 192–93, 445 N.Y.S.2d 68, 71, 429 N.E.2d 746, 749 (1981); *O'Brien v. City of Syracuse*, 54 N.Y.2d 353, 357, 445 N.Y.S.2d 687, 688, 429 N.E.2d 1158, 1159 (1981); *Reilly v. Reid*, 45 N.Y.2d 24, 27, 407 N.Y.S.2d 645, 647, 379 N.E.2d 172, 174 (1978)). This bar applies not only to claims actually litigated in a prior proceeding, but also to claims that could have been litigated there. *See Balderman v. U.S. Veterans Admin.*, 870 F.2d 57, 62 (2d Cir. 1989); *Fay v. South Colonie Cent. Sch. Dist.*, 802 F.2d 21, 29 (2d Cir.1986); *Smith v. Russell Sage College*, 54 N.Y.2d 185, 192–93, 445 N.Y.S.2d 68, 71, 429 N.E.2d 746, 749 (1981).

■ This bar against later claims based upon the same cause of action is, however, subject to certain limitations, one of which is that it will not be applied if the initial forum did not have the power to award the full measure of relief sought in the subsequent litigation. *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994); *Davidson*, 792 F.2d at 278. This limitation is operative in the present case because damages for civil rights violations are generally not available in an Article 78 proceeding. *See Davidson*, 792 F.2d at 278. Accordingly, since the plaintiff asserts claims *for damages* under 42 U.S.C. § 1983, and does not request any other form of relief in his complaint, *see Fay*, 802 F.2d at 30 (Although plaintiff was not barred from pursuing § 1983 claims for damages in federal court, he was barred from litigating his equitable claims because he "could have litigated his claims for injunctive relief in the Article 78 proceeding...."), the doctrine of res judicata is inapplicable to this case.

### B. *Collateral Estoppel*

The defendants next contend that, having had a full and fair opportunity to litigate his claims in the Article 78 proceeding, the plaintiff is barred by the doctrine of collateral estoppel from bringing suit in the present action.

■ Under the doctrine of collateral estoppel, also known as issue preclusion, " 'once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case.' " *Burgos v. Hopkins*, 14 F.3d 787, 789 (2d Cir.1994) (quoting *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980)). "Collateral estoppel 'protects litigants from the expense and vexation attending multiple lawsuits, conserves

judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions.'" *Remington Rand Corp. v. Amsterdam–Rotterdam Bank, N.V.,* 68 F.3d 1478, 1485 (2d Cir.1995) (quoting *Montana v. United States,* 440 U.S. 147, 153–54, 99 S.Ct. 970, 973–74, 59 L.Ed.2d 210 (1979)). As in the case of res judicata, a federal court must give a prior state court decision the same preclusive effect, for purposes of collateral estoppel, that the courts of that state would give it. *See Colon v. Coughlin,* 58 F.3d 865, 869 n. 2 (2d Cir.1995) (citing *Kremer v. Chemical Constr. Corp.,* 456 U.S. 461, 466, 102 S.Ct. 1883, 1889, 72 L.Ed.2d 262 (1982)).

■ Under New York law, the doctrine of collateral estoppel "only applies if (1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding." *Colon,* 58 F.3d at 869 (citing *Hill v. Coca Cola Bottling Co.,* 786 F.2d 550, 552–53 (2d Cir.1986); *Kaufman v. Eli Lilly & Co.,* 65 N.Y.2d 449, 455, 492 N.Y.S.2d 584, 588, 482 N.E.2d 63, 67 (1985)); *see Burgos,* 14 F.3d at 792 (quoting *Schwartz v. Public Admin.,* 24 N.Y.2d 65, 298 N.Y.S.2d 955, 246 N.E.2d 725 (1969)). "The party asserting issue preclusion bears the burden of showing that the identical issue was previously decided, while the party against whom the doctrine is asserted bears the burden of showing the absence of a full and fair opportunity to litigate in the prior proceeding." *Colon,* 58 F.3d at 869 (citing *Kaufman,* 65 N.Y.2d at 456, 492 N.Y.S.2d at 588, 482 N.E.2d at 67).

■ Turning to the present action, the Court is of the view that the defendants have failed to meet their burden of showing that the Article 78 proceeding actually and necessarily decided the issue of whether the plaintiff's federal constitutional rights were violated through the absence of constitutionally sufficient procedures. In a § 1983 action, *federal* constitutional standards, rather than state law, define the requirements of procedural due process. *See Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 (2d Cir.1990) (citing *Cleveland Bd. of Educ. v. Loudermill,*

470 U.S. 532, 541, 105 S.Ct. 1487, 1492–93, 84 L.Ed.2d 494 (1985)). It does not appear to the Court, however, that the Article 78 proceeding was actually and necessarily decided on the basis of federal constitutional standards.

In the Article 78 proceeding, plaintiff claimed, among other things, that his "right to due process, as provided for by the constitutions of this state and of the United States of America was violated" because he did not receive a hearing before the Temporary Release Committee prior to his formal removal from the work release program. Lerner Aff., Ex. A, at 2. By decision dated June 18, 1992, the Supreme Court, Queens County, dismissed plaintiff's Article 78 petition on the ground that plaintiff's "removal from the work release program was lawful." *Roucchio v. Coughlin,* slip op., at 2 (Sup.Ct. Queens County June 18, 1992) (Lerner Aff., Ex. D). As the basis for its determination, the court concluded that "[i]f the [plaintiff] was initially removed from the work release program without being accorded those hearings required by regulation (*see* NYCRR § 1904.2), the respondent remedied this omission by providing the [plaintiff] with an opportunity to appear for a removal hearing in April 1992." *Id.* at 2. On October 17, 1994, the Second Department unanimously affirmed the dismissal of plaintiff's Article 78 petition, finding that the plaintiff "failed to establish that the respondent violated any statutory requirement or denied his constitutional rights in reaching his determination." *Roucchio v. Coughlin,* 208 A.D.2d 749, 618 N.Y.S.2d 548 (2d Dep't 1994) (Lerner Aff., Ex. I).

■ Under the law of the Second Circuit, it is well established that where an adequate prior hearing is required, a postdeprivation hearing is inadequate to meet the requirements of due process. *See Patterson v. Coughlin,* 761 F.2d 886, 893 (2d Cir.1985), *cert. denied,* 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986); *see also Walker v. Bates,* 23 F.3d 652, 657–58 (2d Cir.1994) (use of administrative appeal process to cure any procedural defects in prior hearing did not bar prisoner's claim for relief under § 1983), *cert. denied,* —— U.S. ——, 115 S.Ct. 2608,

132 L.Ed.2d 852 (1995). "Once a cause of action for a [federal] constitutional violation accrues, nothing that the state does subsequently can cut off the § 1983 claim." *Patterson*, 761 F.2d at 893. This standard was not addressed by the Article 78 court, which concluded, without setting forth its analysis, that "[i]f the [plaintiff] was initially removed from the work release program without being accorded those hearings required by regulation (*see* NYCRR § 1904.2), the respondent remedied this omission by providing the [plaintiff] with an opportunity to appear for a removal hearing in April 1992." *Rouchio v. Coughlin*, slip op., at 2 (Sup.Ct. Queens County June 18, 1992) (Lerner Aff., Ex. D). Further, this standard is not discussed in the decision of the Appellate Division. Accordingly, the Court is unable to conclude that the defendants have sustained their burden of establishing that the Article 78 proceeding actually and necessarily decided the identical issue of the sufficiency of the procedures employed under federal constitutional standards. Therefore, the doctrine of collateral estoppel does not preclude the plaintiff from litigating his § 1983 claims in this Court.

## V. Defendant Coughlin's Personal Involvement

█ Defendant Coughlin, the Commissioner of the New York State Department of Correctional Services at the time of the events in suit, contends that the plaintiff's complaint must be dismissed against him because he was not personally involved in the alleged violation of plaintiff's federal constitutional rights. According to this defendant, the plaintiff improperly seeks to hold him liable for damages under the doctrine of *respondeat superior*, which is unavailable in actions brought under 42 U.S.C. § 1983. *See Monell v. Department of Social Servs.*, 436 U.S. 658, 691–92, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978) (A defendant's personal involvement in the alleged constitutional violation is a prerequisite to the imposition of damages.).

█ "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of [monetary] damages

under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir.1994) (internal quotations and citations omitted). A defendant may be personally involved in a constitutional deprivation in one of the following ways:

[1] The defendant may have directly participated in the infraction.

[2] A supervisory official, after learning of the violation through a report or appeal, may have failed to remedy the wrong.

[3] A supervisory official may be liable because he or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue.

[4] [A] supervisory official may be personally liable if he or she was grossly negligent in managing subordinates who caused the unlawful condition or event.

[5] [S]upervisory liability may be imposed where an official demonstrates "gross negligence" or "deliberate indifference" to the constitutional rights of inmates by failing to act on information indicating that unconstitutional practices are taking place.

*Wright*, 21 F.3d at 501; *see Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.1995); *Williams v. Smith*, 781 F.2d 319, 323–24 (2d Cir.1986) (citations omitted); *McCann v. Coughlin*, 698 F.2d 112, 125 (2d Cir.1983) (holding that defendant Coughlin had actual or constructive notice of unconstitutional procedures, and therefore could not escape personal responsibility).

A review of the plaintiff's complaint reveals it sufficiently to allege the personal involvement of defendant Coughlin through the second method described above, on the ground that this defendant is a supervisory official, who, upon being provided with a copy of the plaintiff's Article 78 petition, had actual or constructive notice of the alleged constitutional violation and failed to remedy the wrong. *See* Compl. at 5; *Wright*, 21 F.3d at 501; *McCann*, 698 F.2d at 125. Accordingly, this defendant's motion must be denied.

## VI. Plaintiff's Cross–Motion for Summary Judgment

█ Finally, the plaintiff, asserting that the facts of this case are uncontroverted,

cross-moves for summary judgment on the ground that the defendants' conduct in removing him from the work release program without a hearing deprived him of a constitutionally protected interest without due process of law. This request is opposed by the defendants on the grounds that material facts remain in dispute, and that they have not yet been afforded an opportunity to conduct discovery.

Under the law of the Second Circuit, a district court must weigh the following considerations in evaluating whether to grant a motion for summary judgment with respect to a particular claim:

> First, summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Second, the burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists. In considering that, third, all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought. Fourth, the moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case. When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper.... Finally, the trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding, it does not extend to issue-resolution.

*Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1223–24 (2d Cir.1994) (internal case citations omitted). In evaluating the above considerations, a court must be mindful of whether the purported factual dispute is material, because "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

Upon consideration of the parties' contentions, the plaintiff's cross-motion for summary judgment must be denied at this juncture as premature. *See* Fed.R.Civ.P. 56(f). Among other things, the Court observes that material issues of fact exist concerning the circumstances necessary to give rise to a liberty interest under *Tracy v. Salamack,* 572 F.2d 393 (2d Cir.1978) (per curiam), with respect to the plaintiff's removal from the work release program. *See supra* Discussion Part III.B. In addition, a genuine factual dispute remains as to whether the defendants' actions in failing to provide the plaintiff with a timely hearing were the result of mere inadvertence, or negligence, on their part. This dispute is material because conduct that is merely negligent does not give rise to a constitutional deprivation that is actionable under 42 U.S.C. § 1983. *See Daniels v. Williams,* 474 U.S. 327, 330, 106 S.Ct. 662, 664, 88 L.Ed.2d 662 (1986) (citations omitted). Further, the record is unclear as to whether any of the defendants will be able to assert a qualified immunity defense on the ground that "their conduct [did] not violate clearly established [federal] statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *see Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985) (immunity is from suit, and not merely from liability); *Davis v. Scherer,* 468 U.S. 183, 194, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984) (for purposes of determining the availability of qualified immunity with respect to claims brought under 42 U.S.C. § 1983, the right allegedly violated must be a *federal* right, as opposed to a right created under state law). For these reasons, the plaintiff's cross-motion for summary judgment must be denied at this time.

## CONCLUSION

In accordance with the foregoing, the Court enters the following orders in this action:

(1) Defendants' motion to dismiss the complaint is DENIED in its entirety.

(2) Plaintiff's cross-motion for summary judgment is DENIED in its entirety without prejudice to reapply upon the completion of discovery.

SO ORDERED.